482 S.E.2d 147

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Julie WYATT, Defendant Below, Appellant.**

**No. 23260.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1996.

Decided Dec. 12, 1996.

14.  *See supra* note 6.

James M. Cagle, E. Joseph Buffa, Jr., Charleston, for Appellant.

Kristen L. Keller, Chief Deputy Prosecuting Attorney, Beckley, for Appellee.

ALBRIGHT, Justice:

Appellant, Julie Wyatt, appeals[1] her convictions of child abuse and child neglect with bodily injury, malicious assault, and murder of a child by failure to provide medical care. Appellant first challenges the constitutionality of W.Va.Code § 61–8D–2. In addition, along with various other alleged errors, she argues that jury instructions related to the charge of murder by failure to provide medical care were erroneous and confused the jury, that the court erred in refusing to permit expert testimony on "battered women's syndrome," and that the court erred in allowing the contents of a letter prepared by the state medical examiners office to be read to the jury in violation of the confrontation clause. Because we find that the jury instruction related to the charge of murder by failure to provide medical care was misleading and misstated the applicable law, we reverse the June 22, 1995 order of the Circuit Court of Raleigh County and remand for a new trial.

## FACTS

Appellant Julie Wyatt, defendant below, lived with Kevin Browning and his two young sons, Derek, age two-and-one-half, and Derek's four-year-old brother. On the morning of February 4, 1994, Derek collapsed into a coma. He was taken to the hospital, where he died on February 8, 1994. Thereafter, Ms. Wyatt gave a statement to the police in which she explained that she was alone with the two children at the time of Derek's collapse. She stated further that on February 4, 1994, Derek behaved normally, until he suddenly collapsed.

Ms. Wyatt was subsequently indicted and tried for child abuse resulting in bodily injury, child neglect resulting in bodily injury,

first degree murder of a child caused by failure or refusal to provide medical care, malicious assault, and first degree murder. She was tried on that indictment before a jury.

Evidence at trial indicated that Derek had been beaten over a period of days before his collapse. Ms. Wyatt alleged that Derek's father, Kevin Browning, inflicted those beatings. The evidence further indicated that Derek's body was covered with bruises, especially his feet, which were totally black. Derek also had a bald spot on the back of his head, which Ms. Wyatt explained was the result of Kevin Browning repetitively pushing Derek backwards, causing him to hit his head on the floor. Ms. Wyatt further alleged that she failed to seek help for Derek because her relationship with Kevin Browning, who was absent at the time of the child's collapse, had been violently abusive over a period of time. Ms. Wyatt testified that, at the time immediately prior to the child's collapse, she was afraid to seek medical attention for the child, and thus report the extensive abuse inflicted on the child by Kevin Browning, for fear he would return and further abuse her. However, upon the child's collapse, Ms. Wyatt immediately ran for help.

Kevin Browning, who had originally been charged with the same offenses, testified at the trial after pleading guilty to child abuse resulting in injury and child neglect resulting in injury and after the remaining charges against him of murder and malicious wounding had been dismissed. Despite his prior plea of guilty, Kevin Browning testified that he had never injured the child and had pleaded guilty only due to the advice of counsel and because he perceived that he had neglected to properly look after the children.[2] He testified further that although he never personally witnessed any abuse, he believed

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme

Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

2. Kevin Browning testified that his lawyer advised him that no jury would convict him of anything less than the charges to which he pled guilty.

Julie Wyatt, his live-in girl friend of several years, perpetrated the abuse. He stated that although he was aware that Ms. Wyatt was a strict disciplinarian, he did not realize that she had inflicted such injuries until he saw his son in the hospital. He explained that he did not previously observe the bruises on his son because Derek was always dressed in footed sleepers that covered his body. He explained further that he never bathed Derek or changed his diaper, and thus he never saw the child unclothed.

It was apparently undisputed that the child died of shaken baby syndrome. The State offered medical evidence that the injuries causing the child's collapse and subsequent death probably occurred near the time the child collapsed and was also related to a history of mistreatment on prior days. The defense countered with expert evidence tending to show that the collapse was caused by injuries occurring the previous evening.

In light of Ms. Wyatt's assertions that she feared for her safety by reason of her abusive relationship with Kevin Browning, the defense attempted to pursue a battered woman syndrome theory of defense. In support of this theory, defense counsel offered the testimony of an expert witness, a psychologist, Dr. Veronen. The State objected to the use of the theory and also objected to the expert's testimony on the grounds that it did not satisfy the criteria for scientific expert testimony. After in camera testimony by the expert, the trial court refused to allow her to testify regarding battered women's syndrome, but ruled that the expert would be permitted to testify regarding the appellant's mental state at the time of the alleged offense. Trial defense counsel ultimately declined to call the expert to testify before the jury.

At the conclusion of trial, Ms. Wyatt was found guilty on all but the last count, which charged the traditional elements of first degree murder. The jury also returned a recommendation of mercy with its verdict of guilty of first degree murder of a child caused by failure or refusal to provide medical care. By order dated June 22, 1995, the Circuit Court of Raleigh County sentenced Ms. Wyatt to three sentences of two-to-ten years each for the child abuse, child neglect, and malicious assault counts, and life with mercy for her conviction of first degree murder by failure to provide medical care, with all sentences to run concurrently.[3] It is from this order that Ms. Wyatt now appeals.

### COUNT III

Appellant, who is represented here by counsel retained for appeal and not by counsel appointed for trial, assigns several errors. We begin by discussing those assignments directly related to Count III of the indictment.[4] Appellant contends here that Count III is based on an unconstitutionally vague statute, that the count was duplicitous, and that the trial court erred in instructing the jury on the elements of the crimes charged by Count III and in re-reading that instruction to the jury during its deliberations.

**Constitutionality:** Here appellant contends that W.Va.Code § 61–8D–2 (1988)[5] is

---

**3.** We note that under W.Va.Code § 61–8D–4(b), Ms. Wyatt's sentence for child neglect resulting in injuries should have been one-to-ten years.

**4.** Count III of the indictment states:

And the Grand Jurors of Raleigh County, West Virginia, upon their oaths aforesaid, further present that JULIE WYATT, on or about the 31st day of January, 1994 through the 4th day of February, 1994, in the said County of Raleigh, being the custodian, as defined by law, of Derrick [sic] Browning, an infant child under her care, custody or control, did unlawfully, feloniously, maliciously and intentionally, by her failure or refusal to provide the infant necessary medical care, or by her knowingly allowing another person, Kevin Browning, to unlawfully, feloniously, maliciously and inten-

tionally fail or refuse to provide Derrick [sic] Browning necessary medical care, cause the death of the said Derrick [sic] Browning.

**5.** West Virginia Code § 61–8D–2 states, in pertinent part:

(a) If any parent, guardian or custodian shall maliciously and intentionally cause the death of a child under his or her care, custody or control by his or her failure or refusal to supply such child with necessary food, clothing, shelter or medical care, then such parent, guardian or custodian shall be guilty of murder in the first degree.

(b) If any parent, guardian or custodian shall cause the death of a child under his or her care, custody or control by knowingly allowing any other person to maliciously and

unconstitutionally vague because it applies to a custodian, as defined by W.Va.Code § 61-8D-1(4), which reads as follows:

"Custodian" means a person over the age of fourteen years who has or shares actual physical possession or care and custody of a child on a full-time or temporary basis, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceeding. "Custodian" shall also include, but not be limited to, the spouse of a parent, guardian or custodian, or a person cohabiting with a parent, guardian or custodian in the relationship of husband and wife, where such spouse or other person shares actual physical possession or care and custody of a child with the parent, guardian or custodian.

■ Appellant argues that because the definition can be read to apply to nearly everyone who may have temporary physical possession of a child, with or without legal custody, and because such a person may be convicted of murder under the statute for merely *knowing* that a child is being deprived of medical care by another and allowing that deprivation to continue, even if that other person's conduct is found to be malicious only at some later time. It appears that appellant's argument addresses only subsection (b) of the statute and that counsel's construction of the crime defined there overlooks important elements of the conduct there prohibited. The criminal intent element of the offense defined by subsection (b) is that the conduct there prohibited be done "knowingly". With two exceptions [6] we have not found a criminal case in which this Court has addressed the import of such an element in the context of a criminal case. We have examined cases from the mother state [7] and elsewhere addressing the issue. We find that a satisfactory and compelling definition

has been expressed in § 2.02(2)(b) of the Model Penal Code (American Law Institute, *Official Draft 1962*) and today adopt that definition for use in prosecutions under W.Va.Code § 61-8D-2(b):

(b) *Knowingly.*

A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

■ In light of that definition, we look briefly at the definition of the crime set out in W.Va.Code § 61-8D-2(b). We perceive that the crime there defined is to knowingly allow another to maliciously and intentionally fail to act, resulting in the death of a child. So read, we find appellant's contention without merit. We read the statute as requiring that the defendant have knowledge that the failure of another to act is both malicious and intentional and an awareness that, by allowing another to engage in such malicious and intentional conduct, the child is being denied necessary food, clothing, shelter, or medical care. Where the death of a child results from the knowing failure to take reasonable steps in all the surrounding circumstances to stop the deprivation of such necessities, we believe that the statute gives adequate notice that such failure by a person having the actual physical possession of the child, for at least some time, will constitute murder. Since we believe the definition of such crimes is within the province of the Legislature, we

---

intentionally fail or refuse to supply such child with necessary food, clothing, shelter or medical care, then such other person and such parent, guardian or custodian shall each be guilty of murder in the first degree.

6. *State v. Parks*, 161 W.Va. 511, 512, 243 S.E.2d 848, 850 (1978) (explained that the words "knowingly or intentionally to possess" as contained in W.Va.Code, 60A-4-401(c), require

proof of intent to possess.); *State v. Halida*, 28 W.Va. 499, 504 (1886) (opined that the work "knowingly," was at least equivalent to the words "designedly and unlawfully.").

7. *Good v. Commonwealth*, 155 Va. 996, 154 S.E. 477 (1930); *Gottlieb v. Commonwealth*, 126 Va. 807, 101 S.E. 872 (1920).

find no constitutional infirmity in the statute or its application to a "custodian".[8]

In light of this discussion, we hold that W.Va.Code § 61–8D–2(b) is not impermissibly vague by reason of its incorporation of the definition of "custodian" from the provisions of W.Va.Code § 61–8D–1(4). However, in a prosecution under W.Va.Code § 61–8D–2(b), an accused is entitled to instructions defining the term knowingly, requiring that the defendant have knowledge that the charged failure of another to act is both malicious and intentional and that the accused had an awareness that by allowing another to engage in such malicious and intentional conduct, the child was being denied necessary food, clothing, shelter or medical care.

**Duplicitous allegations.** Appellant next asserts that Count III was duplicitous in that it charged violation of W.Va.Code § 61–8D–2(a) in one paragraph and subsection (b) of the statute in a second paragraph, allowing a fatal variance of proof at trial and making it virtually impossible to ascertain whether all twelve jurors concurred in their verdict by reason of evidence beyond a reasonable doubt as to either paragraph or, in the alternative, whether some voted to convict based on evidence that satisfied them of guilt as to one paragraph, while others voted to convict being satisfied of guilt under the second paragraph. Unfortunately, trial counsel preserved no objection on this ground, nor does the record disclose any motion that the indictment be severed or that the State be required to elect. Therefore, there is no discussion of the issue of duplicity found anywhere in the trial record.

In the absence of an objection in relation to a motion to sever or a motion to elect, we note that under Rule 8(a) of the West Virginia Rules of Criminal Procedure, it is clear that the two offenses not only may be,

but must be, charged in the same indictment. We do not at this time proceed to a plain error analysis, because we believe the trial court can deal effectively with the matter upon retrial.

**Instructions:** As noted, appellant complains that the jury was not properly instructed with respect to Count III of the indictment and that the trial court erred in rereading the instruction on that count to the jury during its deliberations. Utilizing State's Instruction No. 6, with some modifications, the jury was instructed with regard to Count III of the indictment as follows:[9]

The Court instructs the jury that the defendant, Julie Wyatt, stands charged in Count 3 of the Indictment with Murder of a Child by Failure to Provide Medical Care.

A person is guilty of this offense when he or she is the custodian of a child and maliciously, intentionally, and with pre-mediation [sic] fails to supply said child necessary medical care, or knowingly allows another person to do so, causing the child's death.

Malice is a subjective state of mind in the defendant. It may be proven by evidence of circumstances surrounding the crime, such as words and conduct of the defendant both before and after the event. If also may be proved be [sic] a deliberate cruel act against another indicating a heart disregarding social duty and fatally bent on mischief.

Therefore, if you find from the evidence beyond a reasonable doubt that Julie Wyatt was the custodian of Derek Browning, a minor child, and that she maliciously, intentionally, and with mediation [sic] failed to supply the child necessary medical care, causing the child's death, then you should find her guilty of Murder by Fail-

---

8. We note that trial counsel asserted as an additional ground for unconstitutionality that the penalty was disproportionate to that applied to an actual perpetrator of physical abuse. Although that ground was not assigned as error by appellate counsel, we have examined that ground and find it without merit. One reason for our conclusion is that we perceive that such a perpe-

trator could be charged and convicted under the traditional elements of the crime of murder.

9. The trial transcript does not include the instruction as it was actually read to the jury. The above quote reflects the instruction as it was amended by the court in preparation for reading it to the jury.

ure to Provide Medical Care as charged in Count 3 of the Indictment.

◼ Appellant contends that Count III of the indictment and State's Instruction No. 6, which is quoted above, improperly allowed two separate theories for a murder conviction. Appellee argues that appellant's trial counsel failed to object to this instruction on the grounds now raised and that, therefore, we may not consider this assignment of error. The record indicates that paragraph four of the instruction, as originally offered by the State, contained the language "or knowingly allowed Kevin Browning to do so." Defense trial counsel indicated a concern over the language, and the prosecutor agreed to remove it. However, trial counsel failed to request that the similar language be removed from the second paragraph as well. Thereafter, counsel objected to the instruction only on the ground that it was not supported by the evidence. Because counsel never raised the herein addressed issue, the error now claimed was not preserved.

◼ Notwithstanding the failure of defense trial counsel to preserve appellant's objections, we find that State's Instruction No. 6, as modified and given, constitutes plain error. We recognized that the ultimate responsibility for properly instructing the jury lies with the trial court. *State v. Dozier*, 163 W.Va. 192, 255 S.E.2d 552 (1979).[10] We have reviewed the instructions as a whole to see if, upon consideration of all instructions, any error we perceive was corrected, and we believe that it was not. This Court has recognized that "[t]o trigger application of the 'plain error doctrine', there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

◼ We believe that the instruction is confusing, misleading, and incorrectly states the law. It is not clear from the instruction whether the trial court intended to instruct the jury only with regard to subsection (a) of W.Va.Code § 61–8D–2, or whether the court intended to instruct on both subsections (a) and (b). While the second paragraph of the instruction includes in some manner many of the elements of both subsections (a) and (b), the fourth paragraph appears to instruct the jury that it should find Julie Wyatt was guilty if it found that Julie Wyatt herself failed to provide the medical care, a fact relevant only to the offense defined by subsection (a) of the statute. If the court intended to instruct only with regard to subsection (a), we believe that the instruction fails to clearly inform the jury that it must find that Julie Wyatt maliciously and intentionally caused the death of the child. We believe the instruction requires only an intent to deprive the child of medical care and the resulting death of the child, falling short of the statutory requirement that the accused intend the death of the child.

Moreover, the language included in the second paragraph of the instruction, which indicated that a person is guilty of murder of a child by failure to provide medical care when such person knowingly allows another person to fail to provide medical care, was confusing and misleading. That part of the instruction left the jury in doubt as to whether it was considering a charge that Ms. Wyatt herself failed to provide the medical care, as the crime was defined in subsection (a), or whether it could find that her crime constituted allowing another to deny such care, as contemplated by subsection (b) of the statute. As noted by appellant's brief in a different connection, this opened the door for some members of the jury to convict on

---

**10.** In *State v. Miller*, we limited the grounds for attacking an instruction to which no objection was made. At note 23, we stated:

Concededly, the cases from this Court have sent out conflicting signals as to the existence of doctrines, other than plain error, that might permit a litigant to seek appellate review of alleged errors not objected to in the lower court. *See State v. Dellinger*, 178 W.Va. 265, 358 S.E.2d 826 (1987); *State v. Dozier*, 163

W.Va. 192, 255 S.E.2d 552 (1979). These cases seem to suggest that in addition to plain error, there is an unwaivable constitutional right to a proper jury charge in criminal cases. Today, we declare that in West Virginia criminal cases the sole bases for attacking an unobjected to jury charge are plain error and/or ineffective assistance of counsel.

*State v. Miller*, 194 W.Va. 3 at 17 n. 23, 459 S.E.2d 114 at 128 (W.Va.1995).

one theory and some on another. In addition, State's Instruction No. 6 was not supplemented with any instruction on the meaning of the term "knowingly" and fails on its face to give the jury any guidance on the somewhat differing elements of the two offenses.

Finally, we note that the trial court was itself concerned about the instruction and the traditional elements of murder in the first degree, because the court instructed the jury that premeditation was an element of the offense when, in fact, that element is not included in the definition of the crime in either subsection (a) or subsection (b) of the statute. State's Instruction No. 6 required that the custodian "maliciously, intentionally and with premeditation fail[ ] to supply said child necessary medical care . . . causing the child's death." " ' "Instructions in a criminal case which are confusing, misleading or incorrectly state the law should not be given." Syllabus Point 3, *State v. Bolling,* 162 W.Va. 103, 246 S.E.2d 631 (1978).' Syllabus Point 4, *State v. Neary,* [179] W.Va. [115], 365 S.E.2d 395 (1987)." Syl. pt. 9, *State v. Murray,* 180 W.Va. 41, 375 S.E.2d 405 (1988). "It is reversible error to give an instruction which is misleading and misstates the law applicable to the facts." Syl. pt. 4, *State v. Travis,* 139 W.Va. 363, 81 S.E.2d 678 (1954).

We also believe that if the court intended to instruct the jury with regard to the elements contained in both sections (a) and (b) of W.Va.Code § 61–8D–2, then the fourth paragraph of the instruction omitted the "knowingly" requirement of § 61–8D–2(b). "The trial court must instruct the jury on all essential elements of the offenses charged, and the failure of the trial court to instruct the jury on the essential elements deprives the accused of his fundamental right to a fair trial, and constitutes reversible error." Syllabus, *State v. Miller,* 184 W.Va. 367, 400 S.E.2d 611 (1990).

Furthermore, we note that the error surrounding this issue was compounded when the court later re-read some of the instructions to the jury, including State's Instruction No. 6. The second time this instruction was read, the court omitted the fourth paragraph, potentially reinforcing any confusion already created by the instruction.

It is beyond question that such substantial confusion over the proper elements of the offense or offenses which the jury was considering materially affected the right of appellant to full and fair consideration of her case and prejudices the fairness and integrity of the trial. Accordingly, for reasons stated, we find that the giving of State's Instruction No. 6 constituted plain reversible error.

### RE-READING OF INSTRUCTIONS

Appellant argues that the court erred by re-reading only a part of the instructions to the jury after a jury request, which had the effect of erroneously charging the jury as to a crucial element of the crimes charged.

After deliberating for a short time, the jury asked that the court re-read the instructions defining the charges against the appellant. Defense counsel asked that the court re-read all of the instructions. The court refused and read the five instructions that defined the counts of the indictment.

We find no error in the re-reading of only a portion of the instructions. We have previously held that " '. . . [I]t is usually not error for the trial court to comply with a request of the jury in the matter of re-reading to them instructions that they may wish to hear.' *State v. Price,* 114 W.Va. 736, 740, 174 S.E. 518, 520 (1934)." Syl. pt. 3, *State v. Pannell,* 175 W.Va. 35, 330 S.E.2d 844 (1985).

Thereafter, the jury requested guidance a second time. One of appellant's trial attorneys opined that State's Instruction No. 4 properly answered the jury's question. However, after some discussion, the court decided to read State's Instruction No. 2, and defense co-counsel agreed. Because no objection was made to the reading of State's Instruction No. 2, we find this error has been waived. Upon re-trial, if there is a request for the re-reading of a part of the instructions, or it is deemed appropriate to re-read a part of the instructions to respond to a jury question, it may be appropriate to consider that re-reading of a portion of instructions "is

usually not error", but error may arise where the portion read omits a related portion of the charge which explains or expands upon the re-read portion. *Pannell* at 39, 330 S.E.2d at 848 ("Certainly we can envision a situation where the trial court's selective re-reading of instructions would unfairly prejudice the jury.").

## BATTERED WOMEN'S SYNDROME

As noted above, the principal defense offered by appellant was that her condition as a battered woman interfered with her freedom of action in the care of the deceased child and left her afraid to report and otherwise deal with the condition of the child prior to the time the child collapsed. Appellant argues that the trial court erred in refusing to permit an expert on "battered women" to testify concerning what has come to be known as the battered women's syndrome or BWS and appellant's state of mind or mental condition arising from her alleged status as a battered woman.

Apparently, this issue first arose in pre-trial proceedings related to defense expenses. At that time, the trial judge said that he did not "really think there is such a thing" as BWS. Nevertheless, defense counsel obtained the services of Dr. Lois Veronen, a psychologist, who, after interviewing Ms. Wyatt, prepared to testify at trial. During the trial, the prosecution requested an in camera hearing to determine the admissibility of Dr. Veronen's testimony. Near the end of the State's case, the doctor gave her testimony in camera. The trial court initially ruled that Dr. Veronen's testimony would be excluded. The court commented first, that he did not believe that the use of the battered woman syndrome had been expanded beyond use in a claim of self-defense, and, second, it was not clear that the appellant had suffered abuse at the hands of the child's father. Defense counsel then asked if the court would reconsider its ruling if there was testimony that Kevin Browning, Derek's father, abused the appellant. The court indicated that if such testimony were presented, it would reconsider allowing the doctor to testify regarding the appellant's frame of mind. Near the end of appellant's case, counsel asked the court whether Dr. Veronen would be permitted to testify. The court ruled that the doctor would be permitted to testify only as to appellant's state of mind and that she would not be permitted to testify about the battered women's syndrome as such. Because of some difficulty in the transcription of the record, it cannot be discerned whether counsel objected to the court's ruling at that time. In any event, the defense opted not to call Dr. Veronen, even on the issues for which the trial court indicated it would admit her testimony.

At the in camera hearing, Dr. Veronen testified as follows:

Julie Wyatt is suffering from post-traumatic stress disorder; more specifically, the battered woman's syndrome, which contains some additional elements that are not necessarily specifically stated in the post-traumatic stress disorder diagnosis. And that is the identification of the mental disorder.

\* \* \* \* \* \*

[H]er perception was not that this child was in danger or that this child was being intentionally harmed in a grave manner. Her perception that she adopted was that of Kevin Browning's ... she did not perceive the child in grave danger. She did not recognize the severe condition.

\* \* \* \* \* \*

She did not recognize her—her obligation because she did not recognize it as a severe condition.

Further, Ms. Wyatt's counsel questioned Dr. Veronen as follows:

Q. [D]o you believe that ... the condition that you have diagnosed would have caused her to be unable, if the law placed upon her a duty to interfere or a duty to report, unable to conform her conduct to the requirement of the law?

A. Yes, ...

... But because of this disorder perpetrated and caused by violence, she was not able to conform to the point—her perception was altered to the point that she did not act.

It appears that Dr. Veronen's findings were based upon a "history of victimization form" drafted by the doctor and one of her colleagues, and a similarly drafted "fear survey." Dr. Veronen testified that her findings, measured by these instruments, were based solely on the appellant's pre-trial self-reporting. Finally, Dr. Veronen agreed that applying battered woman's syndrome to a case such as this is novel.

Here, appellant argues that all but one of the charges against her required intent, and that Dr. Veronen would have opined that appellant did not possess the required intent because she suffered from battered woman's syndrome. Appellant argues that Dr. Veronen had been qualified as an expert on battered woman's syndrome in numerous jurisdictions, including Kanawha County, that her testimony was admissible and relevant, and that its probative value was not outweighed by an unfair prejudice or jury confusion. Appellant finally argues that Dr. Veronen's testimony should have been permitted even though this was not a case of self-defense and relies in part on *State v. Lambert,* 173 W.Va. 60, 312 S.E.2d 31 (1984), which did not involve self-defense.

Appellee responds that, in a murder trial, in the absence of any defense of coercion, insanity, or self-defense, there is no error in the trial court's ruling. The State contends that expert testimony concerning the battered woman's syndrome should be limited to evidence of the defendant's state of mind at the time of the crime. Appellee argues that appellant mistakenly relies upon *State v. Lambert,* which involved a coercion defense and a failure of the trial court to give a coercion instruction because the one offered by the defense was legally erroneous. The *Lambert* Court held that the trial court had a duty to correct the instruction. Moreover, appellee contends that appellant offered no evidence that Kevin Browning had taken any action to restrain her from offering assistance to Derek during the fourteen hours preceding his collapse. Appellee submits that the State objected to the introduction of Dr. Veronen's testimony because it failed to satisfy relevancy requirements, failed to assist the trier of fact, as required by Rule 702

of the West Virginia Rules of Evidence and failed to satisfy the *Daubert/Wilt* tests we adopted in syllabus points 3, 4, and 6 of *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995).

In essence, appellee argues that the scientific basis of Dr. Veronen's testimony fails the *Daubert/Wilt* tests, that the first of Dr. Veronen's test instruments was not independently validated, and that the second test instrument made no attempt to determine malingering. The State challenges Dr. Veronen's testimony as departing from recognized standards for the diagnosis of battered women's syndrome and asserts that her opinions are therefore not admissible. Finally, appellee submits that the decision to reject, or limit, expert testimony is reviewable only for abuse of discretion, citing *State v. LaRock,* 196 W.Va. 294, 470 S.E.2d 613 (1996).

On the record before us, we cannot conclude that the trial judge committed reversible error in limiting the testimony of Dr. Veronen to psychological testimony relating to Ms. Wyatt's state of mind and prohibiting her testimony on battered women's syndrome. Although we are baffled by the failure of defense trial counsel to utilize the opportunity presented by the trial court to offer the permitted testimony, we believe any retrial of this case will present ample opportunity for the court and counsel to revisit the issues presented by Dr. Veronen's testimony. In that light, we will limit our comments to the arguments presented on appeal that bear on that eventuality.

First, we agree that the principal use of battered women's syndrome testimony has been in the context of self-defense, in cases where the battered person is accused of murdering her batterer. However, in *State v. Lambert,* 173 W.Va. 60, 312 S.E.2d 31 (1984), this Court recognized that a history of domestic violence can indeed be a factor that may negate criminal intent. As the State reminds us in its brief, that case concerned the defense of coercion. In that case, the accused claimed that she committed the acts constituting the alleged crime precisely because her safety was threatened by a known abuser if she did not commit those acts. Here, we have no such direct connection

between the prohibited conduct and the risk of additional domestic violence.

Second, by addressing the general subject of BWS in the context of first degree murder as defined by W.Va.Code § 61–8D–2, we have no intention of limiting the import of *State v. DeBerry*, 185 W.Va. 512, 408 S.E.2d 91 (1991), *cert. denied*, 502 U.S. 984, 112 S.Ct. 592, 116 L.Ed.2d 616 (1991), regarding the absence of the element of intent in prosecutions for neglect under W.Va.Code § 61–8D–3, or of altering the standards for the proof of abuse under W.Va.Code § 61–8D–1, *et seq.* We address the subject of BWS only with respect to the elements of maliciously and intentionally causing the death of a child, under W.Va.Code § 61–8D–2(a) or causing the death of a child by knowingly allowing another to maliciously and intentionally deny the necessities enumerated by the statute to a child, under subsection 2(b) of that article.

**▉** Third, we agree with the State that the admission of expert testimony tending to negate the criminal intent elements of the crimes defined by W.Va.Code § 61–8D–2, by reason of the impact of a history of domestic abuse on the accused, must be preceded by a showing that such evidence as is admissible under the standards of *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied*, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994). We believe that the State's assertions which question the particular scientific basis upon which Dr. Veronen's prior testimony was advanced deserve scrutiny under our *Wilt/Daubert* standards.

**▉** Fourth, we recognize battered women's syndrome as a particularized version of post-traumatic stress disorder, of which, for instance, rape-trauma syndrome is another example. Inasmuch as it appears that these disorders have been identified by experts in the scientific fields to which they relate as recognized disorders,[11] we anticipate that the testimony of a knowledgeable expert on those subjects may well meet the *Wilt* standards and offer testimony that will assist the trier of fact in determining the issues of criminal intent presented by Count III of the indictment before us. Indeed, as the testimony of Dr. Veronen adduced in the in camera hearing below discloses, if the *Wilt/Daubert* standards are met, expert testimony may tend to establish either the lack of malice, intention, or awareness, and thus negate or tend to negate a necessary element of one or the other offenses charged.

## LETTER FROM MEDICAL EXAMINER

Appellant also argues that the court violated the confrontation clause by allowing the contents of a letter to be read to the jury.[12] The letter in question was written by Dr. Livingston, a former assistant to Dr. Sopher, Chief Medical Examiner for the State of West Virginia. The letter was addressed to the prosecutor and contained, in part, Dr. Livingston's opinion that the injuries which resulted in the child's death occurred close to the time of death, a time when the appellant was alone with the children. Dr. Livingston performed the autopsy on the deceased child and prepared an autopsy report, along with the letter in question. Because Dr. Livingston was no longer employed by the Medical Examiner, Dr. Sopher, as Dr. Livingston's former supervisor, reviewed the autopsy report and provided related testimony.[13] During Dr. Sopher's testimony, the prosecutor read one sentence from Dr. Livingston's letter and asked Dr. Sopher whether he concurred with the opinion expressed in that sentence. Dr. Sopher was also asked whether he agreed with the opinions contained in

11. Jane Campbell Moriarty, Psychological and Scientific Evidence in Criminal Trial §§ 7:2 and 7:3 (1996).

12. Appellant also argued in her brief that the prosecutor misread the letter. We note, however, that by order dated June 27, 1996, the Circuit Court of Raleigh County granted the State's motion for correction of the transcript. The order states that the court listened to the trial tape and found that the prosecutor said "low" and not "no." Consequently, the court found that the prosecutor did not misread the letter. The court noted further that defense counsel heard the tape and agreed that the correct word was "low," but the court noted that counsel preserves his objection to correction of the transcript.

13. This procedure has previously been accepted by this Court. *State v. Linkous*, 177 W.Va. 621, 355 S.E.2d 410 (1987); *State v. Jackson*, 171 W.Va. 329, 298 S.E.2d 866 (1982).

the body of the letter. The letter was never admitted into evidence.

■ Although appellant now raises the confrontation clause, we again do not find from our review of the record that this issue was raised below. We have closely examined the actual use of the letter in testimony before the jury. In effect, it appears that the letter was used to refresh Dr. Sopher's recollection regarding an opinion formed by his deputy with respect to official duties performed by the deputy under Dr. Sopher's direction. The letter was written by Dr. Sopher's office and, therefore, belonged to that office; it reported on opinions formed by that office as a part of its official functions and was used essentially to refresh Dr. Sopher's recollection and test whether the doctor, in his official capacity, concurred in an opinion earlier rendered by his office. With respect to that opinion, Dr. Sopher was available for cross-examination, and there is no showing that the facts, data or scientific theories upon which the opinion was based were not readily available to the defense with adequate preparation. Moreover, it appears that the letter was not admitted into evidence, but, as a business record, it might well have been admitted under the well-rooted exception to the hearsay rule for business records, now encompassed within Rule 803(6) of the West Virginia Rules of Evidence. One seeking to establish that a matter violates the Constitution of this State or the United States bears the burden of establishing the violation. *Robinson v. Charleston Area Medical Center,* 186 W.Va. 720, 726, 414 S.E.2d 877, 883 (1991) ("[A] facial challenge to the constitutionality of legislation is the most difficult challenge to mount successfully. The challenger must establish that no set of circumstances exists under which the legislation would be valid ...."). With respect to that small portion of Dr. Sopher's testimony at issue and the reference to his assistant's letter to the prosecutor prepared as a

part of his official duties, we do not believe appellant has met that burden.

## PROSECUTORIAL MISCONDUCT

■ Appellant complains of several incidents that she characterizes as prosecutorial misconduct. Appellant complains that even though the prosecutor knew that the court had excluded Dr. Veronen's testimony on battered women's syndrome, the prosecutor improperly asked the appellant about Dr. Veronen and also improperly commented on Dr. Veronen's expertise during cross examination.[14] Trial counsel failed to object to this line of questioning.

■ Appellant next complains that the court committed plain error by permitting the State to question the appellant and the appellant's witnesses about the appellant's bad character and bad acts, when no character evidence was offered by the appellant. The evidence complained of is the testimony the prosecutor elicited from various witnesses regarding appellant's temper and history of violent behavior, her history of school suspensions. Appellant also contends that the prosecutor made improper comments regarding appellant's character during closing arguments. Again, appellant's trial counsel made no timely objection. This Court believes that questions regarding appellant's temper and violent behavior may well have been relevant in the context of a cross-examination of an accused who is charged with violent acts and has denied them. In that context, comment in closing argument on such conduct may also be appropriate.

■ Appellant argues further that the prosecutor improperly developed the unavailability of the decedent's five-year-old brother, who was an eyewitness to the abuse. The State presented the testimony of a psycholo-

---

14. The prosecutor was questioning the appellant regarding her psychiatric history and her recent psychiatric examinations. When the appellant failed to mention that she had been examined by Dr. Veronen, the prosecutor asked "[w]hat about Dr. Veronen?" The prosecutor then asked a couple of brief questions regarding when and why the appellant saw Dr. Veronen. After establishing that defense counsel made the referral, and that the examination was related to the abuse the appellant claimed to have suffered at the hands of Kevin Browning, the prosecutor commented "[a]nd, of course, you're aware she calls herself, at least, a battered woman's expert; right?"

gist who had recently examined the child to explain that the child was too young to testify. This testimony was apparently offered so that the jury would not think the prosecution was withholding a witness. However, appellant complains that the prosecution elicited testimony that the defense initially contacted the doctor, that the child had made statements to detectives, that he was traumatized by what he had seen, and that the doctor's opinion was that the child was not a reliable witness. Again, there was no defense objection to this testimony.

Later, when the State cross-examined a pathologist called by the defense, the prosecutor questioned the doctor regarding her knowledge of the existence of the eyewitness. Defense counsel objected to the question, and the court cautioned the prosecutor to stay away from statements by the eyewitness. Appellant argues that the prosecutor's conduct was an attempt to suggest to the jury that the defense had something to hide. We note that when objection was finally made, the trial court gave caution to the prosecutor and offered an instruction to the jury. In those circumstances, we find no reversible error. However, upon retrial, we assume such conduct will not be repeated on either side.

Appellant also contends that the prosecutor made inflammatory and misleading comments during summation. Although there were no objections during the State's closing arguments, appellant argues that the inflammatory and misleading conduct of the prosecutor was egregious enough to warrant a finding of plain error. Appellant further complains that the prosecutor misled the jury by presenting testimony from former co-defendant Browning, the decedent's father, which the prosecutor knew or should have know was patently untrustworthy. Again, no timely objections were made on these points.

■ We note that trial counsel objected to only one of the above assigned errors. " ' "Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal." Syllabus Point 1, *State Road Commission v. Ferguson*, 148 W.Va. 742, 137

S.E.2d 206 (1964).' Syl. pt. 3, *O'Neal v. Peake Operating Co.*, 185 W.Va. 28, 404 S.E.2d 420 (1991)." Syl. pt. 5, *Voelker v. Frederick Business Properties*, 195 W.Va. 246, 465 S.E.2d 246 (1995). We have earlier discussed the requirements for recognizing plain error and need not repeat those here. Suffice it to say that, except as to the matters next discussed in this opinion, we do not find reversible error in the matters just detailed although the cumulative effect of what is here recited raises considerable doubt that the trial in this cause was characterized by fair prosecutorial conduct and zealous defense of the accused.

■ In examining the record with respect to the issue of whether appellant's character was improperly placed into issue, we were also directed by appellant's counsel to questions posed by the State to the appellant about some past participation in satanic rituals. We believe that such questions regarding satanic rituals are facially irrelevant and highly prejudicial in the absence of probative evidence that the central issues in this case were related to any such rituals. Our examination of the record discloses absolutely no connection between some past, and even rumored, involvement in such rituals and the charges under consideration. While there again was no timely objection to the satanic ritual questions, we find that the evidence was irrelevant and therefore inadmissible under Rule 401, W.Va.R.Evid. Furthermore, even if some justification is presumed from the record before us for such evidence, its highly prejudicial effect would far outweigh any probative value. Rule 403, W.Va.R.Evid. We are persuaded that in the circumstances of this case, the only purpose for this evidence was to prejudice the jury and that it may well have had that effect. We condemn its introduction and find that it constituted plain error, there being no showing of relevance or probative weight.

In light of our findings regarding the satanic ritual questions, we reiterate here that:

" 'The prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. In keeping with his position, he

is required to avoid the role of a partisan, eager to convict, and must deal fairly with the accused as well as the other participants in the trial. It is the prosecutor's duty to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law.' Syl. pt. 3, *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977)." *State v. Critzer,* 167 W.Va. 655, 280 S.E.2d 288 (1981).

Syl. pt. 1, *State v. Hottinger,* 194 W.Va. 716, 461 S.E.2d 462 (1995) (per curiam).

### CONCLUSION

For the reasons assigned, the judgment of the Circuit Court of Raleigh County is reversed and the case is remanded for a new trial and other proceedings consistent with this opinion.

Reversed and remanded.

RECHT, Judge, sitting by temporary assignment.

McHUGH, C.J., and WORKMAN, J., dissent and reserve the right to file dissenting opinions.